THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARNOLD BICKHAM, Defendant-Appellant.

First District (4th Division)   No. 1—92—0468

Opinion filed July 22, 1993.

JOHNSON, J., dissenting.

James D. Montgomery & Associates, Ltd., of Chicago (James D. Montgomery and Geneace Williams, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HOFFMAN delivered the opinion of the court:

The defendant, Arnold Bickham, was indicted along with a co-defendant for various violations stemming from their alleged performance of abortions without a medical license. Count V of the indictment charged that the defendant violated section 49 of the Medical Practice Act (Ill. Rev. Stat. 1987, ch. 111, par. 4400—49) (hereinafter the Act), by performing a pelvic examination upon the complainant, Charlene Wells, without a medical license. Following a bench trial, the defendant was acquitted on all charges except those under count V, for which he was found guilty and sentenced to 30 months' probation, a $10,000 fine, 2,600 hours of community service, and six months' imprisonment which was stayed as long as the community service was promptly and continuously performed. The defendant now appeals his conviction.

The defendant received his license to practice medicine in Illinois in 1966, but that license was revoked for a period of five years on October 31, 1988.

On June 8, 1989, the complainant went to the Friendship Medical Clinic accompanied by her mother, Diane Sykes, for the purpose of determining whether the complainant was pregnant. When a nurse called the complainant into an examining room, Sykes stood up to accompany her daughter but was told by the defendant that the complainant had to come in alone. The defendant took the complainant to an examining room where he performed a pelvic examination on her by inserting his fingers into her vagina while pressing on her stomach with his other hand. No licensed physician was in

attendance during the course of the examination. After the examination, the defendant walked out of the examining room and told Diane Sykes that the complainant was six to eight weeks pregnant. When Sykes expressed disagreement with this estimate, the defendant responded "I'm the doctor." After completing various forms, the complainant was scheduled to undergo an abortion on the following day.

On June 9, 1989, the complainant returned to the Friendship Medical Clinic, where an abortion was performed upon her by Dr. Inno Obasi. Prior to performing the procedure, Dr. Obasi gave the complainant a second pelvic examination and informed her that she was 13 weeks pregnant. The defendant was also present during this exam.

■■ Under section 49 of the Act, as effective on June 8, 1989, it was a crime for any person without a medical license to hold himself out to the public as being engaged in the diagnosis or treatment of ailments of human beings, or to diagnose or attempt to diagnose, operate upon, profess to heal, prescribe for, or otherwise treat any ailment or supposed ailment of another. Ill. Rev. Stat. 1987, ch. 111, par. 4400—49.

The defendant argues that his conviction should be reversed because his performance of a pelvic examination under the circumstances of this case did not constitute the practice of medicine. In support of this contention, the defendant advances several arguments.

Relying primarily upon the decision of our supreme court in *Biogenetics, Ltd. v. Department of Public Health* (1982), 89 Ill. 2d 92, 431 N.E.2d 1042, the defendant contends that his performance of a pelvic examination upon the complainant on June 8, 1989, did not constitute a violation of the Act because it was done under the authority and supervision of Dr. Obasi, a licensed physician, who conducted his own pelvic examination prior to performing the complainant's abortion on June 9, 1989. The defendant's contention in this regard must fail for two reasons.

■■ First, although the defendant testified that he only performed pelvic examinations at the request of a licensed physician, Dr. Obasi testified that he never authorized the defendant to do a pelvic examination for any of his patients. On this point, the defendant argues that Dr. Obasi's testimony should be viewed with suspicion because Obasi had reason to believe that if he admitted he authorized the defendant to perform the examination, Obasi might place himself at risk for criminal prosecution. However, that theo-

rized motivation on Obasi's part was no more compelling than the motivation of the defendant, who had already been charged with a crime, to testify to the contrary. In any case, the trial judge heard the testimony of the witnesses and observed their demeanor; the question of their credibility and the weight to be given to their testimony was for him to determine as the trier of fact. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 535 N.E.2d 889; *People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402.) The trial judge determined that the defendant did not perform the pelvic examination upon the complainant under the direction or supervision of a licensed physician. When we view the evidence in this case in the light most favorable to the State (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267), we are unable to say that no rational trier of fact could have so found.

Second, the defendant's reliance upon *Biogenetics, Ltd. v. Department of Public Health*, 89 Ill. 2d 92, is misplaced because the facts and issues in that case are readily distinguishable from those in the case at bar. Biogenetics, Ltd., was an ambulatory surgical treatment center licensed to perform first-trimester abortions. It appealed from the suspension of its license for several alleged violations of the Ambulatory Surgical Treatment Center Act (Ill. Rev. Stat. 1979, ch. 111½, par. 157—8.1 *et seq.*) (ASTC Act). One such violation was the performance by Dr. Shaista Khan, a physician awaiting licensing in the United States, of screening pelvic examinations upon patients who had received negative or inconclusive pregnancy test results. Khan made no diagnosis; she simply looked for any evidence of pregnancy and reported her findings to a licensed physician. (*Biogenetics*, 89 Ill. 2d at 97.) In contrast, the defendant in this case not only diagnosed the complainant's pregnancy, but also announced the length of gestation to her and her mother without consulting anyone, much less a licensed physician. Doctor Khan did not identify herself as a doctor to the patients, but the defendant here did so. Doctor Khan performed under the direct supervision of a licensed physician whereas, as indicated earlier, the trial judge in this case found that the defendant did not perform the pelvic examination at issue under the direction or supervision of a licensed physician. It is true that the court in *Biogenetics* found that the performance of a pelvic examination by an unlicensed doctor did not constitute the practice of medicine "when performed under the direct supervision of a licensed physician." (*Biogenetics*, 89 Ill. 2d at 98.) However, the court never passed upon the question of

whether such an examination would constitute the practice of medicine when done without direction or supervision.

Next, the defendant argues that his performance of a pelvic examination was not conduct proscribed by the Act. He maintains that his actions did not amount to the diagnosis of an ailment, but merely constituted an inspection to determine if the complainant was pregnant, and if so, the length of her pregnancy.

As indicated above, the Act as it existed at the time of the defendant's conduct barred the diagnosis of ailments but not conditions. In determining the legislative intent behind a particular statute, the plain meaning of the language employed must be given primary consideration. (*Hayes v. Mercy Hospital & Medical Center* (1990), 136 Ill. 2d 450, 557 N.E.2d 873.) To that end, to "diagnose" means to "identify (as a disease or condition) by symptoms or distinguishing characteristics *** [or] to determine the causes of or the nature of by diagnosis." (Webster's Third New International Dictionary 622 (1986).) An "ailment" is defined as "a bodily sickness, disorder, or chronic disease." Webster's Third New International Dictionary 45 (1986).

There is no question that the defendant's acts in performing the complainant's pelvic examination and announcing to her and her mother that she was pregnant constituted a diagnosis. The record also established that the defendant held himself out to both the complainant and her mother as being a doctor at the time he announced his diagnosis. The question for this court is whether it can be said that the defendant diagnosed or attempted to diagnose an "ailment."

Our research found no reported case in Illinois passing upon the question of whether, for purposes of the Act, pregnancy is considered to be an ailment. In *People v. Shaver* (1937), 367 Ill. 339, 11 N.E.2d 400, the issue was raised but left unanswered. We are of the opinion, as was Dr. Julian Schink, the State's expert witness, that pregnancy is a condition as opposed to an ailment.

Thus, under the Act, if the only purpose of a pelvic examination was to determine whether a woman was pregnant, and if so, the length of the pregnancy, then although diagnostic in nature, such an examination would constitute the diagnosis of a condition rather than an ailment, and the defendant's argument might have merit. However, Dr. Schink testified that in addition to the above, a pelvic examination is also performed to confirm that a pregnancy is in the woman's uterus as opposed to her fallopian tube. An ectopic pregnancy is not a condition but is a bodily disorder, or an ailment. As

such, we are of the opinion that the purpose of a pelvic examination is not solely to diagnose the condition of pregnancy, but also involves the diagnosis of the presence or absence of an ailment, an ectopic pregnancy.

Additionally, the defendant maintains that pelvic examinations do not constitute the practice of medicine under the Act because they may be performed by nurses and physician's assistants. (See *Biogenetics*, 89 Ill. 2d at 98; *Sermchief v. Gonzalez* (Mo. 1983), 660 S.W.2d 683.) However, both the Illinois Nursing Act of 1987 (Ill. Rev. Stat. 1987, ch. 111, par. 3501 *et seq.*) and the Physician Assistant Practice Act of 1987 (Ill. Rev. Stat. 1987, ch. 111, par. 4601 *et seq.*) require the practitioner to be licensed or certified by the State and to perform at the direction or under the supervision of a licensed physician. The defendant possessed no license or certificate and, as found by the trial court, did not perform the pelvic examination at issue under the direction or supervision of any licensed physician. The fact that licensed professionals other than physicians may be permitted to perform certain medical procedures under the supervision of a licensed physician does not render the performance of those same procedures by unsupervised and unlicensed individuals outside the ambit of the Medical Practice Act, especially when, as in this case, the unlicensed individual represents himself to be a doctor.

By reason of the foregoing, the defendant's conduct in performing a pelvic examination upon the complainant constituted action proscribed by the Act. The fact that Dr. Obasi conducted his own examination prior to performing complainant's abortion and did not rely upon the defendant's diagnosis is of no consequence, because the Act prohibits the very making of a diagnosis and contains no requirement that the diagnosis form the basis of any medical treatment.

Lastly, the defendant contends that, because a pelvic examination may be performed by physicians' assistants under the supervision of a licensed physician, he should have been charged under the Physician Assistant Practice Act (Ill. Rev. Stat. 1991, ch. 111, par. 4601 *et seq.*) rather than the Medical Practice Act. The argument fails on its merits. The defendant was neither certified under the Physician Assistant Practice Act nor performing the pelvic examination under the supervision of a licensed physician. Additionally, when the State's Attorney has probable cause to believe that a person has committed an offense as defined by any given statute, it is left to his discretion to decide upon the charge to be presented to a

grand jury. *People v. Travis* (1981), 94 Ill. App. 3d 983, 419 N.E.2d 433.

For all of these reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAHILL, J., concurs.

JUSTICE JOHNSON, dissenting:

I respectfully disagree with the majority. Based on my careful review of the evidence, much of which the majority fails to discuss, I cannot join in the majority opinion. For the reasons set forth below, I would reverse the judgment of the trial court.

It is important to note at the outset that defendant was convicted of performing a pelvic examination upon the complainant without a medical license. The majority concedes that an unlicensed individual with sufficient knowledge and training may properly perform a pelvic examination under the direction or supervision of a licensed physician. (See *Biogenetics, Ltd. v. Department of Public Health* (1982), 89 Ill. 2d 92.) Defendant contends that his conviction should be reversed because the conduct for which he was convicted did not constitute the practice of medicine and did not violate the Medical Practice Act (Ill. Rev. Stat. 1987, ch. 111, par. 4400—49). In support of this contention, defendant offers numerous arguments, two of which I will discuss and also which I believe are implausibly rejected by the majority.

Defendant argues that Dr. Obasi authorized him to perform complainant's pelvic examination. The majority rejects this argument, relying heavily on Dr. Obasi's testimony. However, I agree with defendant that Dr. Obasi's testimony that he never authorized defendant to perform pelvic examinations on any of his patients must be viewed with great suspicion. First, copies of an agreement between defendant and Dr. Obasi were introduced which stated that all medical services performed at the Friendship Medical Center (FMC) were under Dr. Obasi's exclusive control, and that Dr. Obasi had complete responsibility and authority over all medical procedures and staff. Second, Dr. Obasi testified that he was told by Investigator Harris that cooperating in defendant's investigation may affect the charges brought against himself. I cannot join in the majority's attempt to discount Dr. Obasi's strong motivation to testify less than truthfully.

Nòtwithstanding the inherently suspicious nature of Dr. Obasi's testimony, other evidence presented at trial casts strong doubt on Dr. Obasi's testimony that he never authorized defendant to perform pelvic examinations. Dr. Moragne, a licensed doctor at FMC, testified that he authorized defendant to perform pelvic examinations and give injections to his patients. Peggy Broadway testified at trial that while defendant performed a pelvic examination upon her, Dr. Obasi was present in the examining room.

Additionally, complainant testified that prior to receiving a second pelvic examination on June 9, 1989, defendant gave her an injection in Dr. Obasi's presence. Then prior to performing complainant's abortion, Dr. Obasi discussed the length of gestation with defendant indicating that Dr. Obasi knew defendant had also performed a pelvic exam upon the complainant. Given the unsatisfactory nature of the evidence upon which defendant's conviction rests, even when viewed in the light most favorable to the prosecution, I am constrained to find that a reasonable doubt exists as to defendant's guilt. *People v. Collins* (1985), 106 Ill. 2d 237, 261.

Likewise, I cannot agree with the majority's conclusion that *Biogenetics, Ltd. v. Department of Public Health* (1982), 89 Ill. 2d 92, is inapposite here. In the present case, there is no dispute that defendant's conduct was virtually identical to that of Dr. Khan as described in *Biogenetics*. In *Biogenetics*, our supreme court emphatically held that none of the activities for which Dr. Khan was charged constituted the practice of medicine when performed under the direct supervision of a licensed physician. (*Biogenetics*, 89 Ill. 2d at 98.) Consequently, *Biogenetics* should control here, especially since the agreement between defendant and Dr. Obasi required that FMC be operated in accordance with the Ambulatory Surgical Treatment Center Act (the Act). Moreover, the fact that FMC may not have been licensed pursuant to the Act is insignificant when compared to the admitted similarities between defendant's and Dr. Khan's conduct.

In spite of *Biogenetics*, the majority would affirm defendant's conviction because he identified himself as a doctor and announced his findings to complainant and her mother. However, defendant was neither charged with nor convicted of holding himself out as a physician. To the contrary, defendant was convicted of performing a pelvic examination without a medical license. Strong and convincing evidence presented at trial suggests that defendant was authorized to perform complainant's pelvic exam. Given the import of this evi-

dence, and in light of *Biogenetics*, I cannot agree that defendant was proved guilty beyond a reasonable doubt.

Defendant also argues on appeal that his performance of a pelvic examination was not proscribed by the Medical Practice Act (Ill. Rev. Stat. 1987, ch. 111, par. 4400—49). In rejecting this argument, the majority states "the [Medical Practice] Act as it existed at the time of defendant's conduct barred the diagnosis of ailments but not conditions." (250 Ill. App. 3d at 145.) The majority further reasons that pregnancy is a condition, not an ailment. If this is so, then defendant's argument should prevail. However, citing Dr. Schink's testimony that pelvic examinations reveal whether a pregnancy is normal or ectopic, the majority strains to conclude that pelvic examinations constitute diagnosing an ailment. Yet, defendant testified that he performed complainant's pelvic examination under Dr. Obasi's direction to determine only whether complainant was pregnant and, if so, the gestational age. No evidence contradicted defendant's testimony in this regard.

Lastly, I would note, as has the majority, that no Illinois court has held that performance of a pelvic examination constitutes the practice of medicine when done without direction. The only Illinois court faced with the question, *Biogenetics, Ltd. v. Department of Public Health* (1982), 89 Ill. 2d 92, declined to answer it. I am persuaded neither by the facts of this case nor by the majority opinion that this court should answer the question in the affirmative.

For the foregoing reasons, I would reverse the judgment of the circuit court.